DAWN SESTITO (S.B. #214011)
dsestito@omm.com
CATALINA VERGARA (S.B. #223775)
cvergara@omm.com
COLLINS KILGORE (S.B. #295084)
ckilgore@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street
18th Floor
Los Angeles, California 90071-2899
Telephone: +1 213 430 6000
Facsimile: +1 213 430 6407

Attorneys for Defendant
TRADER JOE'S COMPANY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NICOLAS R. MARKS, and LORRI A. BOWLING, as individuals and on behalf of all participants in the Trader Joe's Company Retirement Plan,<br><br>Plaintiffs,<br><br>v.<br><br>TRADER JOE'S COMPANY,<br><br>Defendant. | Case No. 2:19-cv-10942-PA-JEM<br><br>**DEFENDANT TRADER JOE'S COMPANY'S REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>Hearing Date: April 27, 2020<br>Hearing Time: 1:30pm<br>Judge: Hon. Percy Anderson<br>Courtroom: 9A<br><br>Complaint Filed: December 30, 2019<br>Complaint Served: January 30, 2020 |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................ 1
II. ARGUMENT ....................................................................................................... 2
    A. Plaintiffs Have Failed to Allege Facts Sufficient to Support Their Imprudence Claim ........................................................................ 2
        1. Plaintiffs' Allegation That the Per-Participant Recordkeeping Fee Was "Roughly" $140 Is a Pure Guess That Cannot Sustain Their Imprudence Claim ......................... 2
        2. Judicially Noticeable Documents Refute Plaintiffs' $140 Per-Participant Fee Allegation .................................................... 3
        3. Plaintiffs' Confusion Regarding the Plain Terms of the Recordkeeping Agreement Do Nothing to Change the Fact That Their "Rough" $140 Per-Participant Fee Allegation Lacks Support ........................................................ 4
        4. Plaintiffs' Reference to Indirect Compensation Does Not Save Their Claim ........................................................................... 6
    B. Each of Plaintiffs' Imprudence Theories Fails As a Matter of Law .......................................................................................................... 8
        1. Any Alleged Failure to Put the Recordkeeping Arrangement Out to Bid Is Insufficient to Support an Imprudence Claim ........................................................................... 8
        2. Plaintiffs' Share-Class Allegations Remain Insufficient to Support a Claim of Imprudence ....................................................... 9
        3. Plaintiffs Have No Support for Their Novel Theory That Capital Research's Collecting and Returning of Fund Revenue Was Imprudent ..................................................... 11
    C. Plaintiffs Concede that the Failure-to-Monitor Claim Is Derivative ............................................................................................... 11
    D. Plaintiffs Cannot Pursue Injunctive Relief ........................................ 12
III. CONCLUSION ................................................................................................. 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................... 3

*Braden v. Wal-Mart Stores, Inc.*,
    588 F.3d 585 (8th Cir. 2009) ...................................................................... 11

*Del Castillo v. Cmty. Child Care Council of Santa Clara Cty., Inc.*,
    No. 17-cv-07243-BLF, 2019 WL 6841222 (N.D. Cal. Dec. 16,
    2019) ............................................................................................................ 9

*Dorman v. Charles Schwab Corp.*,
    No. 17-cv-00285-CW, 2018 WL 6803738 (N.D. Cal. Sept. 20,
    2018) .......................................................................................................... 12

*George v. Kraft Foods Global, Inc.*,
    641 F.3d 786 (7th Cir. 2011) ....................................................................... 8

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) ..................................................................... 10

*Impress Commc'ns v. Unumprovident Corp.*,
    335 F. Supp. 2d 1053 (C.D. Cal. 2003) ..................................................... 12

*Lewis v. Wendy's Int'l, Inc.*,
    No. 09-07193 MMM (JCx), 2009 WL 10672265 (C.D. Cal. Dec.
    29, 2009) .................................................................................................... 12

*Loomis v. Exelon Corp.*,
    658 F.3d 667 (7th Cir. 2011) ..................................................................... 10

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011) ................................................................. 10, 11

*Schneider v. California Dep't of Corr.*,
    151 F.3d 1194 (9th Cir. 1998) ........................................................... 4, 9, 10

*Sprewell v. Golden State Warriors*,
    266 F.3d 979 (9th Cir. 2001), *opinion amended on denial of reh'g*,
    275 F.3d 1187 (9th Cir. 2001) ................................................................. 3, 4

# TABLE OF AUTHORITIES
*(continued)*

**Pages**

*Tibble v. Edison Int'l*,
   729 F.3d 1110 (9th Cir. 2013) .......................................................................... 10, 11

*White v. Chevron Corp.*,
   No. 16-CV-0793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29,
   2016) ........................................................................................................................ 9

*White v. Chevron Corp.*,
   2017 WL 2352137 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x
   453 (9th Cir. 2018) ........................................................................................ 2, 3, 10

*Young v. GM Inv. Mgmt. Corp.*,
   325 F. App'x 31 (2d Cir. 2009) ............................................................................... 9

iii

REPLY ISO
MOTION TO DISMISS
2:19-CV-10942-PA-JEM

## I. INTRODUCTION

Plaintiffs insist that their Complaint contains "detailed facts" supporting their claim that the Trader Joe's Company Retirement Plan ("the Plan") paid unreasonable recordkeeping fees to its recordkeeper, Capital Research & Management Co. ("Capital Research"), but the opposite is true. Beyond boilerplate allegations about ERISA's fiduciary obligations and vague references to allegedly excessive fees, the only concrete allegations pertaining to Capital Research's recordkeeping fees are contained in paragraphs 22, 23, and 39 of the Complaint. In paragraph 22, Plaintiffs allege that Capital Research received $183,075 in direct compensation for its recordkeeping services in 2018. In paragraph 23, they concede that they do not know "the precise amount of fees and/or income Capital Research collects from the Plan." Notwithstanding that concession, they speculate in paragraph 39 that the Plan paid "roughly $140 per participant" per year to Capital Research over the relevant period.

The question presented in this motion is whether those allegations suffice to state a viable claim for fiduciary breach. They unquestionably do not. Plaintiffs cannot simply pluck a "rough" estimate out of the air without any support, label it an imprudent fee, and hope to get past the pleading stage. To conclude otherwise would render federal pleading standards meaningless and would subject every retirement plan in the country to burdensome litigation based on nothing more than a plaintiff lawyer's say-so. Plaintiffs' Complaint must accordingly be dismissed.

To avoid this result, Plaintiffs attempt to manufacture material issues based on facts that are nowhere contained in their Complaint, but they are bound by their pleading. They suggest that Trader Joe's may have paid Capital Research more than what was memorialized in the operative recordkeeping agreement, for example, or that fees paid to "Financial Professionals" under the agreement may be sources of additional recordkeeping fees for Capital Research. Neither of those suggestions is true, but that is beside the point. The issue is whether Plaintiffs have offered anything

beyond speculation to support their allegation that the Plan's annual, per-participant recordkeeping fees were $140 over the relevant period. They have not. Their claim that the Plan paid excessive fees to Capital Research in violation of ERISA's duty of prudence thus cannot proceed. Nor can their derivative claim for failure to monitor.

## II.  ARGUMENT

### A.  Plaintiffs Have Failed to Allege Facts Sufficient to Support Their Imprudence Claim

Plaintiffs' imprudence claim rests on the single, conclusory premise that the Plan allegedly paid Capital Research excessive fees for recordkeeping services. If the Court concludes that Plaintiffs have failed to allege facts sufficient to support that contention, their imprudence claim must fail.[1] Nowhere in the opposition do Plaintiffs disagree with that fact.

#### 1.  Plaintiffs' Allegation That the Per-Participant Recordkeeping Fee Was "Roughly" $140 Is a Pure Guess That Cannot Sustain Their Imprudence Claim

Without citing any case law, Plaintiffs argue that alleging an unsupported amount of recordkeeping fees is sufficient to survive a motion to dismiss. Pls.' Opp. to Mot. to Dismiss ("Opp'n") at 12, Docket No. 21. That is incorrect. A mere guess or estimate of recordkeeping fees does not suffice to state a claim, as the United States District Court for the Northern District of California held in *White v. Chevron*. *See* 2017 WL 2352137, at *15–18 (N.D. Cal. May 31, 2017) ("*Chevron II*"), *aff'd*, 752 F. App'x 453 (9th Cir. 2018) (holding that plaintiffs failed to state a claim for imprudence pertaining to allegedly unreasonable recordkeeping fees where they "offer[ed] a 'guess' as to the per-participant dollar amount for the Plan's recordkeeping arrangement"). Plaintiffs ignore this case in their opposition, and they also fail to acknowledge their concession that they do not know the amount of Capital

---

[1] The imprudence claim hinges entirely on the presence of an unreasonable recordkeeping fee. The label for the first claim for relief is: "Breach of the Duty of Prudence // Unreasonable Recordkeeping Fees." Compl. at p. 14.

Research's compensation for recordkeeping services.  *See* Compl. ¶ 23.  Further, despite filing a 77-paragraph complaint and a 25-page opposition, Plaintiffs provide no information whatsoever on how they came to their $140 per-participant figure.  Plaintiffs complain that they are "not required to include what is tantamount to a comprehensive expert report calculating damages in a pleading," Opp'n at 12, but no one is suggesting that expert analysis is required at this stage.  Something beyond a pure guess is necessary to state a viable claim, however.  The Court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001).  Given the conclusory nature of Plaintiffs' allegations regarding Capital Research's recordkeeping fees, the Court must dismiss Plaintiffs' imprudence claim.  *Chevron II*, 2017 WL 2352137, at *17–18; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**2.     Judicially Noticeable Documents Refute Plaintiffs' $140 Per-Participant Fee Allegation**

Assuming for the sake of argument that the Court were to find the $140 per-participant fee allegation in paragraph 39 to be more than conclusory guesswork, it still should not credit the allegation, as it is contradicted by the plain terms of the Plan's recordkeeping agreement and Form 5500s, which Plaintiffs agree are subject to judicial notice.  *See* Opp'n at 3 n.1 (Plaintiffs "do not object to the Court considering these documents").

Normally, a court must accept allegations in the complaint as true.  It "need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit."  *Sprewell*, 266 F.3d at 988.  Here, the judicially noticeable recordkeeping agreement and Form 5500s demonstrate that Plaintiffs' "rough" estimate of a $140 per-participant recordkeeping fee has no foundation.  As

explained in Trader Joe's motion, under the recordkeeping agreement, Capital Research is entitled to "Standard Ongoing Fees" of $11,650 plus $48 per participant for its recordkeeping services. Mem. P. & A. in Supp. of Mot. to Dismiss ("Mot.") at 7–8, Docket No. 17; Declaration of Catalina Vergara in Supp. of Def.'s Mot. to Dismiss ("Vergara Decl.") Ex. 1 at 14, Docket No. 17-2. Those fees can easily be reduced to a per-participant amount by reference to the total number of participants listed in the Plan's Form 5500s. *See* Mot. at 7–8. Calculating the recordkeeping fee in that manner reveals a per-participant fee of $48.25 to $48.35 over the relevant period, a far cry from Plaintiffs' $140 figure. *Id.* For this additional reason, the Court need not accept Plaintiffs' $140 allegation as true for purposes of evaluating the sufficiency of their Complaint. *Sprewell*, 266 F.3d at 988.

**3.   Plaintiffs' Confusion Regarding the Plain Terms of the Recordkeeping Agreement Do Nothing to Change the Fact That Their "Rough" $140 Per-Participant Fee Allegation Lacks Support**

To paper over their failure to offer any credible factual allegations regarding the actual amount of Capital Research's allegedly excessive recordkeeping fees, Plaintiffs now speculate for the first time that Trader Joe's might have breached the terms of the recordkeeping agreement and paid Capital Research more than what was required under the contract. Opp'n at 4. They offer nothing in the Complaint or otherwise to support that absurd theory. Plaintiffs also attempt to read into the recordkeeping agreement various sources of additional fees—but none of these arguments is grounded in Plaintiffs' Complaint, and none of them does anything to take their alleged $140 per-participant fee out of the realm of guesswork. *See Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (holding that "[i]n determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss"). Although the Court

should not entertain allegations made for the first time in an opposition brief, Plaintiffs' theories fail for the additional reasons stated below.

First, Plaintiffs argue that "there are lots of other ways Capital Research collects money from Plan participants," including through the "Ancillary Fees" described in the recordkeeping agreement. Opp'n at 3, 7. Plaintiffs do nothing to explain how these "Ancillary Fees"—many of which are for individual participant services like loan fees and overnight checks, others of which are for discrete Plan-related services like Plan amendments and IRS filings, Vergara Decl. Ex. 1 at 14–16—might support their allegation that the Plan's recordkeeping fees were "roughly" $140 per participant over the relevant period.

Second, Plaintiffs argue that "millions and millions of dollars" in additional recordkeeping fees may have flowed to Capital Research from subtransfer agency arrangements, selling group agreements, and fund distribution agreements. Opp'n at 4–5. They fundamentally misread the recordkeeping agreement on that score. As the plain terms of the contract make clear, subtransfer agency arrangements, selling group agreements, and fund distribution agreements govern the "Fund Revenue" that is provided by certain investment options in the Plan lineup (as was described in Trader Joe's motion). Vergara Decl., Ex. 1 at 7. It is that "Fund Revenue" that is used, in part, to pay Capital Research's recordkeeping fee (as also explained in the motion). *Id.*; *see also* Mot. at 2, 6–7. Capital Research retains only those amounts necessary to offset its negotiated fees for recordkeeping services and **returns the remainder to the Plan**.[2] Vergara Decl., Ex. 1 at 7. There are no "millions and

---

[2] Specifically, as explained in the agreement, the "Service Provider" (i.e., Capital Research) applies the fund Revenue to its "recordkeeping and administrative services fees," but "does not retain any Fund Revenue as compensation, except to offset the Service Provider's recordkeeping and administrative services fees." Vergara Decl., Ex. 1 at 7. Any Fund Revenue remaining after the payment of the Service Provider's "recordkeeping and administrative services fees" is "deposited to an unallocated Plan account"—in other words, returned to the Plan. *Id.*

millions of dollars" in additional recordkeeping fees to Capital Research hidden in the referenced agreements, in other words.

Finally, Plaintiffs argue that Capital Research might receive additional "Fund Revenue" under the terms pertaining to the Plan's "Financial Professionals." Opp'n at 5. That cannot be true. Capital Research is the "Service Provider" under the agreement. Vergara Decl. Ex. 1 at 6. "Financial Professionals," in contrast, are defined in the agreement as "the broker-dealer firm, the person acting as a registered representative on behalf of the broker-dealer firm, or the Registered Investment Advisor, if any, hired by the Employer or Plan." *Id.* Elsewhere, the agreement makes clear that the "Service Provider" (i.e., Capital Research) and the Plan's "Financial Professionals" are distinct. For example, it states, "[t]he Service Provider [i.e., Capital Research] provides recordkeeping services to the Plan pursuant to this Agreement. ***Other service providers, including Financial Professionals, provide additional services to the Plan.***" Vergara Decl. Ex. 1 at 10 (emphasis added). It also provides that "the Service Provider [i.e., Capital Research] will not be responsible or liable for the performance of such services provided by the Financial Professional or its affiliates or subcontractors." *Id.* Plaintiffs appear not to understand the difference between the investment management fees that are paid to "Financial Professionals" under the agreement for their management of funds in the Plan lineup, on the one hand, and recordkeeping fees, on the other—but this lawsuit has nothing to do with investment management fees, and any such fees paid to "Financial Professionals" are thus irrelevant. They have nothing to do with Capital Research's recordkeeping fees.

### 4. Plaintiffs' Reference to Indirect Compensation Does Not Save Their Claim

Plaintiffs also speculate that Capital Research must have received "millions in indirect compensation"—presumably in addition to their supposed "millions and millions" in fees under the recordkeeping contract. Opp'n at 5–6. Although the

Plan's judicially noticeable Form 5500s state that Capital Research received exactly $0 in indirect compensation for its recordkeeping services,[3] Plaintiffs surmise that Trader Joe's must have falsified the forms, or that Capital Research must have concealed the actual amount of its fees from its client because it knows the fees are excessive. Opp'n at 5–6.

This wild theory is insufficient to defeat Trader Joe's motion. As explained in the motion and repeated above, Capital Research received "Fund Revenue" (i.e., indirect compensation) from certain funds in the Plan lineup—but, with respect to its recordkeeping services, retained only those amounts equivalent to its direct compensation under the recordkeeping contract and returned the remainder to the Plan. *See supra* at 5–6 & n.2; Mot. at 2, 6–7; Vergara Decl., Ex. 1 at 7. Plaintiffs suggest that the Plan's Form 5500s fail to disclose Capital Research's total compensation, Opp'n at 6—but here, too, they are misreading the document. Part I, Section 1 of Schedule C lists the service providers, including Capital Research (and Invesco Funds, for one year), that receive eligible indirect compensation for managing funds in the Plan lineup. *See, e.g.*, Vergara Decl. Ex. 7 at 200 (2018 Form 5500). Part I, Section 2 lists other service providers; here, Capital Research is listed for its role as the Plan's recordkeeper, and the Form 5500s correctly note that Capital Research retained zero dollars in indirect compensation for recordkeeping fees beyond its contractual fees. *See supra* n.3. There is nothing inconsistent with reporting on the Form 5500s that Capital Research received indirect compensation for investment management in Part 1 and retained no indirect compensation for recordkeeping services in Part 2—and there is certainly nothing to support Plaintiffs' fabrication of millions of dollars in additional, concealed recordkeeping fees.

---

[3] Vergara Decl. Ex. 2 at 17, Docket No. 17-3 (2013); Ex. 3 at 57, Docket No. 17-4 (2014); Ex. 4 at 92, Docket No. 17-5 (2015); Ex. 5 at 131, Docket No. 17-6 (2016); Ex. 6 at 167, Docket No. 17-7 (2017); Ex. 7 at 202, Docket No. 17-8 (2018).

**B.      Each of Plaintiffs' Imprudence Theories Fails As a Matter of Law[4]**

      **1.     Any Alleged Failure to Put the Recordkeeping Arrangement Out to Bid Is Insufficient to Support an Imprudence Claim**

Any alleged failure to solicit competitive bids cannot sustain Plaintiffs' imprudence claim without a credible allegation that the recordkeeping fees were actually unreasonable, notwithstanding Plaintiffs' argument to the contrary. And even if Plaintiffs had sufficiently alleged that the recordkeeping fees were unreasonable, Plaintiffs' failure to allege that other recordkeepers could have provided the same services as Capital Research at a lower cost would still doom their theory.

The sole case Plaintiffs cite in their favor, *George v. Kraft Foods Global, Inc.*, 641 F.3d 786 (7th Cir. 2011), is distinguishable. The *George* court held, at the summary judgment stage, that there were material issues of disputed fact regarding whether the defendant's failure to solicit competitive bids for administrative services was imprudent where: (1) plaintiffs presented concrete evidence about the objective level of fees and why they were unreasonable; and (2) the plan fiduciaries had not renegotiated their recordkeeping arrangement for more than fifteen years. *George*, 641 F.3d at 798–99. Neither of those factors is present here. Plaintiffs have alleged no credible facts regarding the alleged unreasonableness of Capital Research's fees and no facts at all regarding whether Trader Joe's could have obtained less-expensive recordkeeping services of the same type and caliber on the market.

This case more closely resembles *Young v. GM Inv. Mgmt. Corp.* and the other cases cited in Trader Joe's motion. Mot. at 10–11. In *Young*, the court held that the plaintiffs did not plausibly allege excessive fees where they "fail[ed] to allege that the fees were excessive relative to the services rendered." 325 F. App'x 31, 33

---

[4] Plaintiffs have confirmed that they do not allege that revenue sharing arrangements are *per se* imprudent. Opp'n at 12–13. For that reason, Trader Joe's does not address the argument further in this brief.

1  (2d Cir. 2009) (Sotomayor, J.) (internal quotations and citation omitted). And in
2  *White*, the court explained that "nothing in ERISA compels periodic competitive
3  bidding." *White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2016 WL 4502808, at *14
4  (N.D. Cal. Aug. 29, 2016) ("*Chevron I*") (dismissing duty of prudence claim despite
5  similar competitive bidding allegations); *see also Del Castillo v. Cmty. Child Care
6  Council of Santa Clara Cty., Inc.*, No. 17-cv-07243-BLF, 2019 WL 6841222, at *5
7  (N.D. Cal. Dec. 16, 2019) (same). Plaintiffs argue that these cases are distinguishable
8  because their Complaint alleges more than a failure to solicit competitive bidding,
9  but they are mistaken, for the reasons explained at length above.

### 2. Plaintiffs' Share-Class Allegations Remain Insufficient to Support a Claim of Imprudence

12 Nor does Plaintiffs' opposition save their inadequately pleaded share-class
13 theory. The Complaint does not mention which specific funds should have been
14 offered as institutional classes, and Plaintiffs' opposition is not the proper vehicle to
15 correct that flaw. *Schneider*, 151 F.3d at 1197 n.1. Moreover, Plaintiffs fail to
16 recognize that there are numerous reasons for a plan to offer retail share classes,
17 including when the expense ratios of such classes are used to offset Plan fees and
18 then refunded to the Plan, as is the case here.

19 The Court should refrain from considering the opposition's arguments (and
20 accompanying table) addressing specific funds, because the Complaint does not
21 contain those allegations. Opp'n at 16–21; *see generally* Compl. Instead, the
22 Complaint simply mentions "American Funds." *See, e.g.*, Compl. ¶ 35. Using the
23 phrase "American Funds" does not give Trader Joe's notice of which fund should
24 have been offered as institutional shares. It is not enough that the Complaint includes
25 high-level allegations about how share classes generally work. Opp'n at 17 (citing
26 Complaint for generic allegations). Similarly, the Court should disregard the bald
27 assertions in the opposition that "[r]etail share classes of the American Funds, with
28

few exceptions, underperform their industry benchmarks and similar investments offered by other mutual fund companies" and that Trader Joe's choosing American Funds is evidence of imprudence given Capital Research's affiliation with the funds. *Id.* at 19. Plaintiffs cite no allegations in the Complaint for those positions, and the Court should disregard Plaintiffs' attempt to transform the opposition into an amended complaint.[5] *Schneider*, 151 F.3d at 1197 n.1.

Even if the Court considers allegations made for the first time in the opposition, none of Plaintiffs' arguments changes the fundamental fact that "ample authority holds that merely alleging that a plan offered retail rather than institutional share classes is insufficient to carry a claim for fiduciary breach." *Chevron II*, 2017 WL 2352137, at *14. Again, Plaintiffs seem to ignore that several courts, including the Ninth Circuit, have specifically "rejected the argument that a fiduciary should have offered only wholesale or institutional funds." *Tibble v. Edison Int'l*, 729 F.3d 1110, 1135 (9th Cir. 2013) ("*Tibble I*") (internal quotations omitted and citation omitted); *see also Loomis v. Exelon Corp.*, 658 F.3d 667, 669–70 (7th Cir. 2011) (granting motion to dismiss claim that fiduciaries should have offered institutional funds); *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (same); *Renfro v. Unisys Corp.*, 671 F.3d 314, 326–28 (3d Cir. 2011). As the Seventh Circuit noted in *Hecker*, "the cheapest possible fund" also "might, of course, be plagued by other problems." 556 F.3d at 586; *see also Loomis*, 658 F.3d at 670 (same); *Tibble I*, 729 F.3d at 1135 (same). Some of these decisions may be limited to their facts, but the allegations here lend themselves to the same conclusion: there is no credible issue with Trader Joe's offering retail share classes for certain funds.

Though Plaintiffs assert otherwise, their attack on retail share classes ***is*** categorical—and therefore inappropriate—given that the Complaint's share-class

---

[5] In any case, Plaintiffs concede that there is "no per se bar on related entities providing an array of services to a plan." Opp'n at 19.

allegations address no particular fund. Plaintiffs cite to *Tibble I* and *Tibble II*, but those cases do not support Plaintiffs' overly broad attack on retail share classes here. The *Tibble I* court explicitly rejected the argument that selecting retail share classes is categorically imprudent, and even Plaintiffs recognize that holding. Opp'n at 21 (citing *Tibble I*, 729 F.3d at 1134–35). This case also *differs* from *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595–96 (8th Cir. 2009), where the plan did not change the particular funds despite underperformance, and where the complaint had alleged that the selection of certain funds was not made in exchange for services rendered, but rather was a quid pro quo for inclusion in the Plan. *Id.* at 596. Those facts are not alleged here. Plaintiffs' broad attack also contrasts with holdings in cases like *Renfro*—where, like here, the plaintiffs did not "challenge the prudence of the inclusion of any particular investment option." *Renfro*, 671 F.3d at 326. Consistent with those courts' analysis, the Court should reject Plaintiffs' share-class theory of imprudence here.

### 3. Plaintiffs Have No Support for Their Novel Theory That Capital Research's Collecting and Returning of Fund Revenue Was Imprudent

The opposition repeats Plaintiffs' gripe that Capital Research collected Fund Revenue, retained the amounts corresponding to its negotiated recordkeeping fee, and returned the remaining Fund Revenue to the Plan. Opp'n at 22–23; Compl. ¶¶ 48–50. But Plaintiffs fail to cite any case, statute, or regulation precluding this type of arrangement. Opp'n at 22–23. The theory thus cannot support Plaintiffs' imprudence claim.

### C. Plaintiffs Concede that the Failure-to-Monitor Claim Is Derivative

Plaintiffs' second claim for relief cannot survive because it is derivative of Plaintiffs' imprudence claim, which fails for the reasons stated above and in Trader Joe's motion. Plaintiffs concede that their failure-to-monitor claim hinges on their imprudence claim. Opp'n at 23. The failure-to-monitor claim thus must be dismissed

as well. *See, e.g.*, *Dorman v. Charles Schwab Corp.*, No. 17-cv-00285-CW, 2018 WL 6803738, at *7 (N.D. Cal. Sept. 20, 2018).

### D. **Plaintiffs Cannot Pursue Injunctive Relief**

Plaintiffs' opposition does not address whether Plaintiffs lack standing to pursue injunctive relief. Instead, Plaintiffs disagree with Trader Joe's procedural posture in arguing that injunctive relief is unavailable. Opp'n at 23–25. Whatever the procedural mechanism, the Court should disallow Plaintiffs' request for such relief, given their status as former Plan participants who may not pursue injunctive remedies. Mot. at 15–17; *see Lewis v. Wendy's Int'l, Inc.*, No. 09-07193 MMM (JCx), 2009 WL 10672265, at *7 n.45 (C.D. Cal. Dec. 29, 2009) (striking plaintiff's request for injunctive relief due to lack of standing); *Impress Commc'ns v. Unumprovident Corp.*, 335 F. Supp. 2d 1053, 1060 (C.D. Cal. 2003) (granting motion to dismiss injunctive relief requested in prayer for relief).

## III. CONCLUSION

For the reasons stated above and in Trader Joe's underlying motion, Trader Joe's respectfully requests that the Court dismiss Plaintiffs' Complaint in its entirety with prejudice.

Dated: April 13, 2020      By:    /s/ Catalina Vergara
                                                       Catalina Vergara

CATALINA VERGARA
DAWN SESTITO
COLLINS KILGORE
O'MELVENY & MYERS LLP
Attorneys for Defendant
TRADER JOE'S COMPANY